IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **Patty Durand.**, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>**Brad Raffensperger**, in his official capacity as Secretary of State of the State of Georgia,<br><br>Defendant. | Case No. ________________<br><br>**Plaintiffs' Motion for a Temporary Restraining Order** |

The plaintiffs respectfully move the Court for a temporary restraining order prohibiting the Secretary of State from disqualifying Patty Durand as a candidate for Georgia's Public Service Commission in District 2 based on the one-year residency requirement set forth in O.C.G.A. § 46-2-1(b). That requirement is unconstitutional as applied to Durand because the Georgia General Assembly redrew district lines on the eve of the qualifying period to exclude Durand specifically.

An expedited decision is necessary in this matter because the Secretary initiated a challenge to Durand's qualifications on April 28, and a hearing before the Office of State Administrative Hearings is scheduled in the challenge on Thursday, May 12, at 9:30 a.m. If the Secretary determines that Durand is disqualified before Georgia's May 24 primary election, he must post signs at all polling places advising voters of the disqualification and that votes for her will not be counted.

## Background[1]

This is an as-applied challenge to the constitutionality of Georgia's one-year residency requirement for members of the Georgia Public Service Commission. O.C.G.A. § 46-2-1(b). The plaintiffs are Durand, whose qualification under the residency requirement is currently subject to challenge, and three of Durand's supporters. They allege that the application of Georgia's residency requirement to Durand unconstitutionally burdens their rights under the Equal Protection Clause and the First and Fourteenth Amendments to the U.S. Constitution. They seek declaratory and injunctive relief prohibiting

---

[1] Unless otherwise noted, all facts come from the verified complaint filed with this motion.

Secretary of State Brad Raffensperger from enforcing the residency requirement against Durand in the 2022 election.

## I. The Georgia Public Service Commission

The Georgia Public Service Commission dates back to 1879. The jurisdiction, powers, and duties of the Public Service Commission are prescribed by state law, and they include broad governmental authority to supervise and regulate common carriers, railroads, and public utilities. O.C.G.A. § 46-2-1 et seq. Among many other duties, the Commission regulates the rates that Georgians may be charged by electric, natural gas, and telephone companies.

Today, the Public Service Commission is a five-member body created under the Georgia Constitution. Ga. const. art. IV, § 1, para. I. Georgia law provides that commissioners are elected statewide for six-year terms. O.C.G.A. § 46-2-1(a). Elections for commissioners are held on a partisan basis.

In 1998, the Georgia General Assembly added a requirement that commissioners must reside within specific districts and must have resided in that district "for at least 12 months prior to election thereto."

O.C.G.A. § 46-2-1(b). Commissioner elections are staggered, and District 2 is up for election in 2022. O.C.G.A. § 46-2-1(d).

The incumbent commissioner from District 2 is Republican Tim Echols, and he is running for re-election.

## II. Durand's Candidacy

Durand has been a Georgia resident for more than 26 years. From January 2011 until February 2021, Durand was the executive director of the Smart Grid Consumer Collaborative, a nonprofit organization working to promote the benefits of creating a next-generation energy infrastructure in the United States. As part of her work, Durand often interacted with commissioners and their staff. She is well known in the energy industry.

Durand stepped down from her position in February 2021 to become a Democratic candidate for Public Service Commissioner in District 2. Durand moved to Gwinnett County, which was in District 2, in June 2021, and she formally launched her campaign for Public Service Commissioner on July 1, 2021.

Durand issued a media advisory announcing her candidacy, and her candidacy was reported in at least five news media outlets across

Georgia. Durand's candidacy was also reported in the *Atlanta Journal Constitution*'s online political newsletter "The Jolt", which is widely read by elected officials and political followers. Durand posted her candidacy on many social media platforms including Twitter, LinkedIn, Facebook and Instagram. Durand also engaged in other typical campaign activities: soliciting friends, neighbors, and colleagues for donations; writing blogs, newsletters and social media posts about Georgia's energy situation and her hopes and plans as a commissioner; speaking on podcasts about her energy background for this office and vision for Georgia if elected; hiring campaign staff; and attending Democratic party events, for example.

In January 2022, Durand filed a campaign-finance report showing that she had raised more than $110,000 for her campaign.

## III. Durand is Drawn Out of District 2

In February 2022, the Georgia General Assembly redrew the Public Service Commission's residency districts with the purpose of excluding Durand from District 2.

On February 7, 2022, Republican Senator John F. Kennedy introduced a bill, known as Senate Bill 472 ("SB 472"), that redrew the

residency districts for the Public Service Commission. He introduced the bill at the request of one or more members of the Public Service Commission, and the new districts were drawn at the direction of one or more members of the Public Service Commission. The new districts remove from District 2 approximately 66 percent of the prior District 2's population, including all of Gwinnett County—which alone comprised approximately 44 percent of the prior District 2's population.

The Senate Reapportionment and Redistricting Committee, chaired by Senator Kennedy, held a hearing on SB 472 on February 16. Public Service Commission Chair Tricia Pridemore presented the bill to the committee. The committee recommended passage of the bill by a vote of 8 to 3. Eight days later, Senator Kennedy presented SB 472 on the floor of the Senate. After vigorous debate, the bill passed on a party-line vote.

On March 2, 2022, the House Legislative and Congressional Reapportionment Committee held a hearing on SB 472. Senator Kennedy, accompanied by Commissioner Pridemore, presented the bill. At the hearing, Commissioner Pridemore testified that "[e]very ten

years, the Public Service Commission is required by law to review our map and put forth a new one." That testimony is not true.

Also at the hearing, Democratic Representative Kim Alexander offered a substitute map for the residency districts in SB 472. House Minority Leader James Beverly presented the map to the committee. Leader Beverly testified that there was no need to redraw the residency districts because the one-person-one-vote requirement does not apply and because, even if it did, the existing districts were already within constitutional limits. The Democratic alternative map presented by Leader Beverly complied with the House's redistricting criteria better than SB 472. It would have shifted far fewer counties and better maintained the cores of the existing districts. It had a lower population deviation. It split fewer cities.

The committee rejected the Democratic substitute on a party-line vote and then recommended passage of SB 472 on a party-line vote.

On Friday, March 4, SB 472 was considered on the House floor. After vigorous debate, the bill passed on a party line vote.

The Governor signed the bill on the same day, which was the last business day before the beginning of Georgia's candidate qualification period on Monday, March 7.

## IV. The Secretary Challenges Durand's Qualifications

Durand established residency in Rockdale County, Georgia, on or about March 6. Rockdale is in the new District 2. She filed paperwork to qualify as a candidate for Public Service Commissioner in District 2 on March 10.

On April 28, 2022, the Secretary of State's office notified Durand that the Secretary of State had initiated a challenge to her qualifications to be a candidate for District 2 based on the residency requirement set forth in O.C.G.A. § 46-2-1(b). In accordance with state law, the Secretary referred the matter to the Office of State Administrative Hearings ("OSAH") for review by an administrative law judge, and he requested an expedited hearing. *See* O.C.G.A. § 21-2-5(b). The Secretary's challenge to Durand's qualifications has been docketed by OSAH as Raffensperger v. Durand, 2225324-OSAH-SECSTATE-CE-122-Barnes, and a hearing on the matter is currently set for Thursday, May 12, at 9:30 a.m.

Once the administrative law judge issues her decision, the Secretary of State must then determine whether Durand is qualified. If the Secretary determines prior to the May 24 primary that Durand is not qualified, he must post signs at all polling places advising voters of the disqualification and that votes for her will not be counted.

## Legal Standard

A plaintiff seeking a temporary restraining order must demonstrate that: (1) there is a substantial likelihood of success on the merits; (2) it will suffer irreparable injury if relief is not granted; (3) the threatened injury outweighs any harm the requested relief would inflict on the non-moving party; and (4) entry of relief would serve the public interest. *See, e.g., Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Windsor v. United States*, 379 F. App'x 912, 916-17 (11th Cir. 2010) (standard for obtaining TRO is identical to that for a preliminary injunction).

## Discussion

### I. The plaintiffs are likely to succeed on the merits.

To determine whether Georgia's durational residency requirement for Public Service Commissioners violates the constitution as applied

here, this Court must apply the balancing test set forth in *Anderson v. Celebrezze*:

> First, a court must evaluate the character and magnitude of the asserted injury to rights protected by the First and Fourteenth Amendments. Second, it must identify the interests advanced by the State as justifications for the burdens imposed by the rules. Third, it must evaluate the legitimacy and strength of each asserted state interest and determine the extent to which those interests necessitate the burdening of the plaintiffs' rights.

*Bergland v. Harris*, 767 F.2d 1551, 1553-54 (11th Cir. 1985) (paraphrasing *Anderson*, 460 U.S. 780, 789 (1983). The same test applies to both of the plaintiffs' claims. *See Cowen v. Ga. Sec'y of State*, 22 F. 4th 1227, 1231-35 (11th Cir. 2022).

Under the *Anderson* test, the level of scrutiny varies on a sliding scale with the character and magnitude of the asserted injury. When, at the low end of the scale, the law "imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson*, 460 U.S. at 788, 788-89 n.9). But when the law places discriminatory or "severe" burdens on the rights of political parties, candidates, or voters, "the regulation must be

'narrowly drawn to advance a state interest of compelling importance.'" *Id*. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1982)). *See, e.g., Graveline v. Benson*, 992 F.3d 524, 535-39 (6th Cir. 2021) (concluding that a discriminatory ballot-access scheme warranted strict scrutiny).

The plaintiff bears the burden of proof on the first step in the *Anderson* test, and the defendant bears the burden on the second and third. *Fulani v. Krivanek,* 973 F.2d 1539, 1544 (11th Cir. 1992); *Bergland*, 767 F.2d at 1554. In this analysis, "the burden is on the state to 'put forward' the 'precise interests … [that are] justifications for the burden imposed by its rules,'" and to "explain the relationship between these interests" and the challenged provisions. *Fulani*, 973 F.2d at 1544 (quoting *Anderson*, 460 U.S. at 789). "The State must introduce evidence to justify both the interests the State asserts and the burdens the State imposes on those seeking ballot access." *Bergland,* 767 F.2d at 1554.

### A. The Character and Magnitude of the Injury

As applied here, Georgia's durational residency requirement for Public Service Commissioners burdens two overlapping rights protected by the First and Fourteenth Amendments: "the right of individuals to associate for the advancement of political beliefs, and the right of

qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes,* 393 U.S. 23, 30 (1968). "Both of these rights, of course, rank among our most precious freedoms." *Id.*; *accord Anderson*, 460 U.S. at 787. The residency requirement also implicates the Equal Protection Clause because it creates a "geographic classification" between persons who can and cannot run for Public Service Commission based on the location and duration of their residence. *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 183-87 (1979); *accord Cowen*, 22 F.4th at 1235. *See also Dunn v. Blumstein*, 405 U.S. 330, 334-35 (1972) (striking down a durational residency requirement for voting as a violation of the Equal Protection Clause).

Both of these injuries have a discriminatory character here because District 2 was drawn specifically to exclude Durand. The General Assembly did not redraw the districts until well after Durand's launched her candidacy, gained momentum, and filed a strong campaign-finance report. Proponents of the bill offered pretextual justifications for the map, suggesting repeatedly that it was required by the one-person-one-vote principle when it was not. Proponents admitted

that the map was drawn by the incumbents. The General Assembly rejected an alternative map that better complied with redistricting guidelines and passed the map strictly along partisan lines—even though members of the Public Service Commission are elected statewide.

In addition, the magnitude of the change to District 2 by itself is staggering. On the last business day before the qualifying period began, the General Assembly removed more than 66 percent of District 2's population. That represents more than a million people who suddenly became ineligible to run for Commissioner in District 2, and more than a million people who suddenly became eligible to run against an incumbent who had already been campaigning for months. To run, those new residents of District 2 would have had to put together an entire campaign in less than a week. Thus, the practical effect of the change to District 2 is undeniably enormous.

Under these circumstances, the application of Georgia's durational residency requirement to Durand's candidacy falls within the Supreme Court's disfavored category of restrictions—those that impose an unequal or discriminatory burden on an identifiable political group.

Restrictions in that category must be subject to heightened scrutiny. *See, e.g., Anderson*, 460 U.S. at 793; *Graveline*, 992 F.3d at 536.

Heightened scrutiny would also be consistent with the approach taken by the district court in *Robertson v. Bartels*, 150 F. Supp. 2d 691, 694-96 (D.N.J. 2001), which addressed the constitutionality of New Jersey's one-year in-district residency requirement for members of the state legislature. Soon after the 2001 round of redistricting, the court applied strict scrutiny based on the fact that the shifting district lines limit the voters' choice of candidates and thereby affect the right to vote. And it did so under circumstances where there was no evidence that any lines were drawn to target any particular candidates. Ten years later, the same court reiterated that holding. *See Robertson v. Bartels*, 890 F. Supp. 2d 519, 530 (D.N.J. 2012) (applying "heightened" scrutiny based on the fact that districts were redrawn seven months before the election and moved approximately one-third of residents into new districts).

This case is also similar to *Headlee v. Franklin County Board of Elections*, 368 F. Supp. 999 (1973), which applied strict scrutiny to a one-year durational residency requirement in a village where, by reason of an annexation close to the election, nearly one-half of the village's

residents would be ineligible to hold office. The court applied strict scrutiny because the durational residency requirement, combined with the recent annexation, "obviously reduces the number of potential candidates for public office and unnecessarily restricts voter choice." *Id.* at 1003.

Here, of course, the restriction on voter choice is even greater than in *Robertson* or *Headlee*. And there is evidence that the changes were specifically drawn to exclude Durand. Under these circumstances, heightened scrutiny is warranted.

### B. Asserted State Interests and Narrow Tailoring

Because the application of Georgia's residency requirement under these circumstances is discriminatory and burdensome, the Secretary of State has the burden of demonstrating (1) that Georgia's asserted interests in the requirement are compelling; and (2) that the requirement is narrowly tailored to serve those interests.[2] *Bergland*, 767 F.2d at 1553-54. Although it remains to be seen what interests the

---

[2] In cases where the burden on the plaintiffs' rights is non-discriminatory but moderate, the *Anderson* test demands an intermediate level of scrutiny. *See, e.g., Cooper v. Raffensperger*, 472 F. Supp. 3d 1282, 1291-92 (N.D. Ga. 2020) (Ross, J.).

Secretary will assert, the State has no legitimate interest in shielding an incumbent from competition. The plaintiffs are therefore likely to succeed on their claims.

## II. The plaintiffs will suffer irreparable harm in the absence of a preliminary injunction.

Harm is irreparable for purposes of a preliminary injunction when "it cannot be undone through monetary means." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328 (5th Cir. 1981). Harms that touch upon the constitutional and statutory rights of political parties, candidates, and voters are generally not compensable by money damages and are therefore considered irreparable. *See, e.g., Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *League of Women Voters v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986); *Ga. State Conference of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1347 (N.D. Ga. 2015).

In this case, the irreparable nature of the injuries is obvious. The Secretary has challenged Durand's qualifications and has sought (and received) an expedited hearing on May 12 in order to disqualify her prior to the May 24 primary election. As a practical matter, she will be unable

to obtain any review of the Secretary's decision before the primary date. If this Court does not step in, voters will be warned not to vote for her, and any votes cast for her will not be counted. And there would be no way to unring that bell.

This *Winter* factor therefore weighs in favor of granting the injunction.

## III. The balance of harms favors the plaintiffs.

The third *Winter* factor requires the Court to consider the potential impact that the requested injunction might have upon the Secretary of State, and to balance that potential with the considerable and irreparable harms that the plaintiffs would suffer should their request be denied. There is no question that the balance of equities tips in the plaintiffs' favor here.

The Secretary of State will suffer no harm if the injunction is granted. He can still disqualify Durand *after* the primary if the plaintiffs do not ultimately succeed.

## IV. A preliminary injunction would serve the public interest.

The public interest in this case is clear. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby*

*Lobby Stores, Inc. v. Sebelius,* 723 F.3d 1114, 1145 (10th Cir. 2013) (en banc) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1131–32 (10th Cir. 2012)), *aff'd* 134 S. Ct. 2751 (2014); *accord League of Women Voters of N.C.,* 769 F.3d at 247. The requested injunction will ensure that voters in the Democratic primary have a choice of candidates that is not limited by the General Assembly's discriminatory district lines. The requested injunction, if granted, would therefore favor the public interest.

## Conclusion

For the foregoing reasons, the Court should issue a temporary restraining order prohibiting the Secretary of State from disqualifying Patty Durand as a candidate for Georgia's Public Service Commission in District 2 based on the one-year residency requirement set forth in O.C.G.A. § 46-2-1(b).

Respectfully submitted this 5th day of May, 2022.

**/s/ Bryan L. Sells**
Georgia Bar No. 635562
Attorney for the Plaintiffs
The Law Office of
Bryan L. Sells, LLC
Post Office Box 5493
Atlanta, Georgia 31107-0493
(404) 480-4212 (voice/fax)
bryan@bryansellslaw.com

## Certificate Of Compliance

I hereby certify that the forgoing PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER was prepared in 13-point Century Schoolbook in compliance with Local Rules 5.1(C) and 7.1(D).

**/s/ Bryan L. Sells**
Georgia Bar No. 635562
Attorney for the Plaintiffs
The Law Office of
Bryan L. Sells, LLC
Post Office Box 5493
Atlanta, Georgia 31107-0493
(404) 480-4212 (voice/fax)
bryan@bryansellslaw.com

## Certificate of Service

I hereby certify that on May 5, 2022, I sent a copy of this filing by email to Russell Willard, Senior Assistant Attorney General and Section Chief for Government Services and Employment in the Office of Attorney General Chris Carr (rwillard@law.ga.gov) and to Ryan Germany, General Counsel for Secretary of State Brad Raffensperger (rgermany@sos.ga.gov).

**/s/ Bryan L. Sells**
Georgia Bar No. 635562
Attorney for the Plaintiffs
The Law Office of
Bryan L. Sells, LLC
Post Office Box 5493
Atlanta, Georgia 31107-0493
(404) 480-4212 (voice/fax)
bryan@bryansellslaw.com