IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| PATTY DURAND, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as Georgia Secretary of State,<br><br>*Defendant.* | CIVIL ACTION<br><br>No. 1:22-CV-1784-WMR |

**ORDER DENYING PLAINTIFFS' MOTION
FOR A TEMPORARY RESTRAINING ORDER**

**I.   INTRODUCTION**

Before the Court is Plaintiffs' Motion for a Temporary Restraining Order (Doc. 2) filed by Patty Durand, who is currently a candidate on the ballot for the Democratic party nomination for Public Service Commissioner for District 2, and by three of her supporters, namely Elizabeth Pinder, Brian Carney, and Elizabeth Rodenroth (who, with Durand, are collectively referred to as "Plaintiffs"). In their Complaint and Motion, Plaintiffs contend that the 12-month residency requirement

for members of the Public Service Commission ("PSC") is unconstitutional as applied to Durand and that "the Georgia General Assembly redrew district lines on the eve of the qualifying period to exclude Durand specifically." (Doc. 1, Compl., ¶ 1; Doc. 2, Motion, p. 1.) In their Motion, Plaintiffs seek a temporary restraining order prohibiting Defendant Georgia Secretary of State Brad Raffensperger (the "Secretary") from disqualifying Durand as a candidate for PSC District 2 based on the 12-month residency requirement set forth in O.C.G.A. § 46-2-1(b).

O.C.G.A. § 21-2-5 (the "Challenge Statute") permits the Secretary to challenge the qualifications of a candidate at any time prior to an election.[1]  Pursuant to the Challenge Statute, an administrative law judge ("ALJ") from Georgia's Office of State Administrative Hearings ("OSAH") recommends factual and legal findings, which are then submitted to the Secretary for review and a final ruling. Under the provisions of the Challenge Statute, the Secretary's decision is subject to

---

[1] The Challenge Statute is referring to the General Election, not the General Primary.

judicial review and can be appealed to the Superior Court of Fulton County, Georgia, as well as to the Supreme Court of Georgia. O.C.G.A. § 21-2-5(e); *see Burgess v. Liberty Cnt'y Bd. of Elections*, 291 Ga. 802, 803 (2012) (candidacy challenge regarding allegations that the candidate did not meet residency requirement was an election contest that fell within the exclusive appellate jurisdiction of the Supreme Court of Georgia).

The Secretary received a complaint from a voter on April 27, 2022, alleging that Durand did not meet the requirement of being a resident of PSC District 2 for 12 months prior to the November 2022 election as required by law. (Doc. 11, Defendant's Ex. 1, p. 10.) On April 28, 2022, the Secretary submitted to OSAH a challenge to the qualifications of Durand as a candidate for the general primary for PSC District 2. (*Id.*, p. 6.) On May 5, 2022, Plaintiffs initiated this action and filed their Motion for a Temporary Restraining Order. This Court conducted an expedited hearing on May 10, 2022.[2]

---

[2] This hearing was argument only; no testimony was received.

For the reasons that the Court articulates in this order, Plaintiffs' motion for a temporary restraining order is denied.

## II.  BACKGROUND AND FINDINGS OF FACT

The PSC is a five-member body created pursuant to the State Constitution of Georgia for the regulation of utilities. GA. CONST. art. IV, § 1, ¶ I. PSC members serve a term of six years. *Id.*; O.C.G.A. § 46-2-1(a). They are elected in statewide elections, which are staggered every two years. O.C.G.A. § 46-2-1(d). To be elected as a member of the PSC from a particular PSC District, a person must have resided in that district for at least 12 months prior to election. O.C.G.A. § 46-2-1 (a), (b).

Following the 2000 decennial census, the Georgia General Assembly amended O.C.G.A. § 46-2-1 to change the boundaries of the PSC districts, effective April 2002. 2002 Ga. Laws 360; *see also Cox v. Barber*, 275 Ga. 415, 416 (2002). Ten years later, following the next census, the PSC districts were revised again, effective May 1, 2012. 2012 Ga. Laws Act 641 (S.B. 382). Following the effective date of the 2012 amendment, PSC District 2 consisted of 29 counties, including Gwinnett

County.[3]  *Id.*

In the Complaint, which is verified under penalty of perjury by Durand, Plaintiffs state that "Durand moved to Gwinnett County, which was [PSC] District 2, in June 2021." (Doc. 1, Compl., ¶ 20.)  Prior to her move to Gwinnett County, Durand was a registered voter in Fulton County and voted in numerous elections in Fulton County, most recently by absentee ballot in December 2020.  (Doc. 11-1, Defendant's Ex. 1, p. 19.)  As part of the 2022 reapportionment process, the Georgia General Assembly reapportioned the five PSC districts as described in O.C.G.A. § 46-2-1, ostensibly to account for population changes throughout Georgia.

---

[3] Specifically, PSC District 2 had the following counties within its jurisdiction following the effective date of the 2012 amendment: (1) Baldwin County; (2) Barrow County; (3) Bibb County; (4) Bleckley County; (5) Burke County; (6) Clarke County; (7) Emanuel County; (8) Glascock County; (9) Greene County; (10) Gwinnett County; (11) Hancock County; (12) Houston County; (13) Jackson County; (14) Jasper County; (15) Jefferson County; (16) Jenkins County; (17) Johnson County; (18) Jones County; (19) Laurens County; (20) Morgan County; (21) Newton County; (22) Oconee County; (23) Putnam County; (24) Screven County; (25) Treutlen County;  (26) Twiggs County; (27) Walton County; (28) Washington County; and (29) Wilkinson County.

(Doc. 11-5, Defendant's Ex. 5, Dec. of Gina Wright, ¶6.)[4] As reflected in the declaration of Gina Wright, Executive Director of the Legislative and Congressional Reapportionment Office, the reapportionment of the PSC districts was primarily driven by significant changes in population, particularly in the metro Atlanta region. Gwinnett County saw the most significant population growth in Georgia. Gwinnett County was moved from District 2 to District 4.[5] Without reapportionment, the population deviation using the 2012 district map would have been 9.94% or over

---

[4] The Court notes that the Plaintiffs claim, and for the purposes of this Order the Court assumes, that the General Assembly's motivation in the redrawing the PSC districts was primarily partisan.

[5] Pursuant to the SB 472 amendment to O.C.G.A. § 46-2-1 effective March 4, 2022, PSC District 2 now consists of the following counties: (1) Banks County; (2) Barrow County; (3) Bulloch County; (4) Burke County; (5) Butts County; (6) Candler County; (7) Chatham County; (8) Clarke County; (9) Columbia County; (10) Effingham County; (11) Elbert County; (12) Emanuel County; (13) Glascock County; (14) Greene County; (15) Hancock County; (16) Hart County; (17) Henry County; (18) Jackson County; (19) Jasper County; (20) Jefferson County; (21) Jenkins County; (22) Lincoln County; (23) Madison County; (24) McDuffie County; (25) Morgan County; (26) Newton County; (27) Oconee County; (28) Oglethorpe County; (29) Putnam County; (30) Richmond County; (31) Rockdale County; (32) Screven County; (33) Spalding County; (34) Taliaferro County; (35) Walton County; (36) Warren County; (37) Washington County; and (38) Wilkes County.

212,000 people; whereas after reapportionment it was reduced to a population deviation of 1.55% and 33,247 people under the 2022 map. (*Id.*, ¶¶ 8, 9.) The PSC redistricting legislation was filed as Senate Bill 472 in the Senate hopper on February 7, 2022, passed the Senate on February 24, 2022, passed the House of Representatives on March 4, 2022, and was signed into law by Governor Kemp that same day. (Doc. 11-3, Defendant's Ex. 3.)

On February 17, 2022 – prior to the Senate's passage of SB 472 – Durand posted on Twitter that Republicans had deliberately removed Gwinnett County (her then county of residence)[6] from PSC District 2 to protect incumbent PSC District 2 Commissioner Tim Echols by moving her residence out of the district. (Doc. 11-1, Defendant's Ex. 1, p. 8 (Durand's tweet with infographic).) Durand states in her Verified Complaint that she "established residency in Rockdale, County, Georgia, on or about March 6, 2022," because "Rockdale [County] is in the new District 2." (Doc. 1, Compl., ¶42.) Durand then filed paperwork to qualify

---

[6] The facts are undisputed that Durand had not lived in Gwinnett County very long, as she moved there only in June 2021 for the purposes of running for the PSC.

7

as a candidate for party nomination for Public Service Commissioner in District 2 on March 10, 2022. (*Id.*, ¶43.)

Notably, in her Declaration of Candidacy and Affidavit, Durand made the sworn statement that, as of the date of the general election on November 8, 2022, she will have been a legal resident of District 2 for one consecutive year. (Doc. 11-1, Defendant's Ex. 1, p. 14.) Of course, this wasn't true, at least as to the 2 days between when the Governor signed Senate Bill 472 and when Durand moved to Rockdale County. Nevertheless, as of the date of this Order, Durand is currently on the Democratic General Primary Election ballot for the statewide primary election to be held on May 24, 2022, along with one other Democratic candidate. (Doc. 11-4, Defendant's Ex. 4.) April 25, 2022, was the earliest date for a Georgia county registrar to mail absentee ballots for the General Primary on May 24, 2022, and advanced, in-person voting began on May 2, 2022.[7]

---

[7] The Office of the Secretary of State's Elections Division provides a Scheduled Elections Calendar of Events for 2022, which is available online at https://www.sos.ga.gov/sites/default/files/forms/2022%20State%20Scheduled%20Elections%20Short%20Calendar.pdf

The Secretary's Office received a written complaint from a voter in a letter dated April 27, 2022, requesting that the Secretary challenge the candidacy qualifications of Durand under the Challenge Statute because Durand will not be a resident of PSC District 2 for one year prior to the November 2022 election. (Doc. 11-1, Defendant's Ex. 1, p. 10.) The complaint from the voter referenced social media posts by Durand in which she acknowledged that she lived outside the current make-up of PSC District 2. (*Id*.) On April 28, 2022, the Secretary initiated a proceeding before OSAH to challenge Durand's residency qualification and requested an expedited hearing of the matter. (*Id*., p. 6.) As of the date of this Order, the Secretary's challenge of Durand's candidacy qualifications before OSAH is set for a hearing on May 12, 2022. (Doc. 11-2, Defendant's Ex. 2.)

On May 5, 2022, Durand and three of her supporters filed this lawsuit. (Doc. 1.) In the Complaint, Plaintiffs seek relief for two claims under 42 U.S.C. § 1983, based on their assertions that Georgia's one-year residency requirement for PSC candidates, as applied to Durand: (1)

violates Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment; and (2) violates Plaintiffs' rights under the First and Fourteenth Amendments. (*Id*., Compl., ¶¶ 49-50.) Before this Court now is Plaintiffs' Motion for a Temporary Restraining Order, through which Plaintiffs ask this Court to prohibit the Secretary from disqualifying Durand as a candidate for PSC District 2 based on the one-year residency requirement. (Doc. 2.)

## III.   LEGAL STANDARD

A temporary restraining order is a drastic remedy that should only be granted in limited circumstances and upon a clear showing of necessity. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). The movant must show that (1) its claims have a substantial likelihood of success on the merits; (2) it will suffer irreparable injury absent injunctive relief; (3) the threatened injury to the movant outweighs any potential harm that might result to the opposing party; and (4) granting the injunction will not disserve the public interest. *America's Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1329 (11th Cir. 2014); *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th

Cir. 2005); *McDonald's Corp.*, 147 F.3d at 1306. The movant must "clearly establish" all four elements. *Cafe 207, Inc. v. St. Johns Cty.*, 989 F.2d 1136, 1137 (11th Cir. 1993). The likelihood of success on the merits is generally considered the most important of the four factors. *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). However, it is axiomatic that before this Court can even consider granting an injunction of any sort, it must have jurisdiction to do so.

## IV. ANALYSIS AND CONCLUSIONS OF LAW

### This Court Lacks Article III Jurisdiction over Plaintiffs' Claims because They Present a Non-Justiciable Political Question.

Article III of the Constitution limits the subject-matter jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. Federal courts have an independent obligation to ensure that subject-matter jurisdiction exists before reaching the merits of a dispute. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020).

This Court finds that Plaintiffs' claims are a political question outside this Court's Article III jurisdiction and are foreclosed by the

Supreme Court's decision in *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019)[8], which held that partisan gerrymandering challenges "present political questions beyond the reach of the federal courts." *Id.* at 2506-07.  Plaintiffs' central contention is that the Georgia General Assembly engaged in impermissible partisan gerrymandering by intentionally drawing PSC District 2 to exclude Durand as a candidate.

The Defendant denies that the General Assembly's redrawing of PSC District 2 was because of partisan reasons, but rather, contends it was simply to balance all of the PSC Districts based on the current population numbers.   But, taking Plaintiffs' allegations as true for

---

[8] In *Rucho*, Chief Justice Roberts and a majority of the Justices of the Supreme Court concluded that Federal Courts did not have jurisdiction to consider constitutional claims that the North Carolina Legislators' congressional redistricting was illegal.  The contention was that the redistricting was impermissible because, while more voters in North Carolina had recently voted for Democratic candidates for Congress than Republican candidates for Congress, the 2016 redistricting had left North Carolina with 10 Republican and 3 Democratic Members of Congress.  As Justice Roberts noted, one of the Republican legislators chairing the redistricting efforts said the maps were drawn that way to elect 10 Republicans and only 3 Democrats only because he did not believe it "[would be] possible to draw a map with 11 Republicans and 2 Democrats."  Still, the Supreme Court found there was no role for the Federal Courts to play in reviewing the matter.

purposes of this motion, the Plaintiffs' complaint of partisan gerrymandering is a political question that this Court has no authority to review. *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1357 (11th Cir. 2007) ("A federal court has no authority to review a political question"). The political question doctrine "protects the separation of powers and prevents federal courts from overstepping their constitutionally defined role." *Id.* (*citing Baker v. Carr,* 369 U.S. 186, 210 (1962)). A case presents a non-justiciable political question if it would require the Court to decide a question with one of the following characteristics:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217. "Significantly, any one of the above-listed characteristics may be sufficient to preclude judicial review." *Made in the USA Found. v. U.S.*, 242 F.3d 1300, 1312 (11th Cir. 2001).

The Supreme Court in *Rucho* held that a partisan gerrymandering challenge, such as the one raised by Plaintiffs here, is a political question because it asks federal courts to weigh in on the allocation of political power between the two major political parties "with no plausible grant of authority in the Constitution, and no legal standards to limit and direct their decisions." *Rucho,* 139 S. Ct. at 2507. The Supreme Court recognized that some amount of partisan gerrymandering is constitutional and inevitable, and to hold that legislators could never consider partisan interests in districting "would essentially countermand the Framers' decision to entrust districting to political entities." *Id.* at 2497.[9]

---

[9] The Constitution clearly commits the "Times, Places and Manner of holding Elections" to state legislatures. U.S. CONST. art. I, §4, cl. 1. And federal courts have long recognized that the Constitution specifically reserves authority regarding the integrity and efficiency of elections to the states. *Storer v. Brown*, 415 U.S. 724, 730 (1974); *Wexler v. Anderson*, 452 F.3d 1226, 1232 (11th Cir. 2006). "[T]he framers of the Constitution intended the States to keep for themselves, as provided by the Tenth

14

*Rucho* rejects the premise that the Constitution allows federal courts to second-guess the allocation of political power by state legislatures, saying that "federal courts are not equipped to apportion political power as a matter of fairness, nor is there any basis for concluding that they were authorized to do so." *Id.* at 2499. Furthermore, even if courts could agree on a standard of "fairness," they would have to determine how much deviation from that standard in pursuit of partisan interests was permissible. *Id.* at 2501. The Supreme Court concluded, "[d]eciding among just these different visions of fairness . . . poses basic questions that are political, not legal. There are no legal standards discernible in the Constitution for making such judgments, let alone limited and precise standards that are clear, manageable, and politically neutral." *Id.* at 2500.

---

Amendment, the power to regulate elections." *Gregory v. Ashcroft*, 501 U.S. 452, 461–62 (1991) (quoting *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973)); *see also Coalition for Good Governance v. Raffensperger*, 2020 U.S. Dist. LEXIS 86996, at *8, No. 1:20-cv-1677-TCB (N.D. Ga. May 14, 2020) ("The Framers of the Constitution did not envision a primary role for the courts in managing elections, but instead reserved election management to the legislatures.").

15

*Rucho*'s reasoning that there are no judicially manageable standards for reallocating political power to try to achieve "fairness" in partisan representation, and that federal courts lack constitutional authority to do so in the first place, applies here. Plaintiffs ask the Court to enjoin the Secretary of State from disqualifying Durand as a candidate for PSC District 2, even though it is undisputed that Durand has not met the durational residency requirements for that office. O.C.G.A. § 46-2-1(b). In this way, Plaintiffs ask the Court to set aside the expressed will of the legislature in both the continuation of the durational residency requirement, as well as its reapportionment of the PSC districts based upon the alleged purely partisan reasons, which this Court has no jurisdictional authority to do. Were this Court to discard Georgia's durational residency requirement and enjoin the Secretary from exercising his statutory authority to disqualify Durand based upon a purely partisan complaint, it would not only undermine the Georgia legislature's role in enacting election laws, but also Georgia's judicial

enforcement of its own elections laws.[10]  Absent clear proof by Plaintiffs that a political question is not at issue, "courts should not substitute their own judgments for state election codes."  *Coalition*, 2020 U.S. Dist. LEXIS 86996 at *8.[11]

## V.  CONCLUSION

Accordingly, this Court DENIES Plaintiffs' Motion for Temporary Restraining Order (Doc. 2).[12]

So ORDERED this 11th day of May, 2022.



WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE

---

[10]  The Plaintiffs' constitutional concerns may be raised in judicial proceedings in the Georgia Courts on appeal from any decision made by Defendant Raffensperger regarding Durand's candidacy. And, the individual Plaintiffs will still have a Democratic candidate which they can support, if they so choose.

[11] The Defendant argues that the Court should also not exercise jurisdiction under the *Younger* Abstention Doctrine, and even if it did, that laches bars the Plaintiffs' claim and/or that the Plaintiffs' claims fail on the merits.  The Court declines to address these issues, as such is unnecessary given that it does not have jurisdiction.

[12] The Court's Order herein does not represent a final ruling, but rather, the Court will consider such a ruling upon the filing by the Defendant of a Motion to Dismiss.